**CRIST v. MORGAN et al. (No. 272–3502.)**

(Commission of Appeals of Texas, Section B.
Dec. 6, 1922.)

Wills ⟷608(3)—Rule in Shelley's Case held
applicable.

A devise to testator's nephews and nieces
of "only" a life estate, "with remainder in fee
at their decease to their heirs," *held* to vest in
such nephews and nieces the fee under the
rule in Shelley's Case; there being nothing
manifesting an intention to use the technical
word "heirs" in the sense of child or children.

Error to Court of Civil Appeals of Eighth
Supreme Judicial District.

Action by Grace Crist against John Mor-
gan and others. Judgment for defendants
was affirmed by the Court of Civil Appeals
(219 S. W. 276), and plaintiff brings error.
Affirmed.

Gano & Gano and H. C. Jarrel, all of Dal-
las, for plaintiff in error.

C. S. Bradley, of Groesbeck, H. C. Bishop,
of Hubbard, R. G. Patton, of Waco, and Chas.
L. Black, of Austin, for defendants in error.

McCLENDON, P. J. The purpose of this
suit, while in form in trespass to try title,
was to construe the will of Daniel Crist;
the particular issue being whether the rule in
Shelley's Case applies to that portion of the
will which devised real estate to the tes-
tator's 11 living nieces and nephews. The
trial court and Court of Civil Appeals held
that the rule applied, and that the nieces
and nephews took title in fee. 219 S. W. 276.

The testator, Daniel Crist, never had any
children, and his wife predeceased him. At
the time the will was executed he had 11
living nieces and nephews, among whom was
Stephen Crist, Sr. All these nieces and neph-
ews at that time had living children. There
was also a deceased niece, Anna Dellis, who
was survived by a number of children. This
suit was brought by Grace Crist, the daugh-
ter and only child and sole heir at law of
Stephen Crist, Sr., against John Morgan, to
recover 140 acres of land, which in a parti-
tion among the devisees of Daniel Crist had
been set aside to Stephen Crist, Sr., who later
conveyed it to Morgan.

It is conceded by all parties that the only
provisions of the will which have any bear-
ing whatever upon the case are the second
and third paragraphs, which are as follows:

"Second. I give devise and bequeath to
Theodocia Littlefield, Reasan S. Stovall, Roda
Dyer, Stephen Stovall, George W. Stovall,
James G. Stovall, Mary Jane Wallace, E. Riley
Starnado; Isaac Crist, Stephen Crist, Sr.,
Mary McClellan and the children of Anna Del-
lis, deceased, all the personal property of which
I shall die possessed, in equal portions, the
children of Anna Dellis, deceased, shall take

one equal portion and all the other legatees
named shall take an equal portion.

"Third. I give, devise and bequeath to Theo-
docia Littlefield, Reasan S. Stovall, Roda Ag-
nes Dyer, Stephen Stovall, George W. Stovall,
James G. Stovall, Mary Jane Wallace, E. Ri-
ley Starnado, Isaac Crist, Stephen Crist, Sr.,
Mary McClellan and the children of Annie Del-
lis, deceased, all the real estate of which I
may die possessed in equal portions, to each
of the said devisees except the children of
Annie Dellis, deceased, for life with remainder
thereof in fee on the decease of each, to his or
her heirs at law. The said children of Anna
Dellis shall per stirpes take an equal portion
of said real estate, in fee simple, without re-
mainder to any one, but the other legatees nam-
ed shall per capita take only a life estate in
an equal portion to each with remainder in fee
at their decease to their heirs."

As we gather the contentions of plaintiff
in error under which it is urged that the rule
in Shelley's Case does not apply to para-
graph 3 of the will in question, they are:

First. That where the manifest intention
of the testator is that the life tenant is to
take nothing more than a life estate as evi-
denced by the restrictive word "only," the
courts of Texas hold that the rule does not
apply.

Second. That the provisions of the will
as a whole show that the word "heirs" as
designating the remaindermen who were to
take at the time of the death of the several
nieces and nephews was used, not in its or-
dinary sense, but as synonymous with chil-
dren.

The first of those contentions is directly
in conflict with a long line of decisions in
this state and with the overwhelming weight
of authority wherever the rule in Shelley's
Case is held to be of force, and the second,
in our judgment, is not tenable. Hancock v.
Butler, 21 Tex. 804; Hawkins v. Lee, 22 Tex.
544; O'Brien v. Hilburn, 22 Tex. 624; Simon-
ton v. White, 93 Tex. 50, 53 S. W. 339, 77
Am. St. Rep. 824; Lacey v. Floyd, 99 Tex.
112, 87 S. W. 665; Seay v. Cockrell, 102 Tex.
280, 115 S. W. 1160; Hunting v. Jones (Tex.
Com. App.) 215 S. W. 959; Brown v. Bryant,
17 Tex. Civ. App. 454, 44 S. W. 399 (writ of
error refused).

"No question connected with the law has en-
listed more learning and discussion than that
which relates to the nature and operation of
this rule, as a principle of law for the inter-
pretation of wills and deeds, and none occu-
pies a more prominent place in the history of
law of real property." Ware v. Richardson, 3
Md. 505, 56 Am. Dec. 762.

The rule is no doubt of great antiquity,
and it is said to be capable of definite trac-
ing as far back as 1325. When the case from
which it derives its name was decided (1590)
a discussion arose which, according to Chan-
cellor Kent, became "so vehement and so pro-

tracted as to rouse the specter of haughty Elizabeth." 4 Kent, Com. 233, note. After the case had been argued for three days the Queen required the Lord Chancellor "to assemble all the Justices of England before him and upon conference had between themselves touching the said questions, to give their resolutions and judgments thereof." This was done, and a practically unanimous decision upholding the rule was the result. 29 L. R. A. (N. S.) 970. There was another outburst against the rule when in 1770 the decision was rendered in Perrin v. Blake. At that time a number of celebrated treatises were written by eminent law-writers upon the subject, and it is stated by Lord Campbell in his Life of Chief Justices that the bar of the entire kingdom was for several years divided into factions known as "Shellyites" and "anti-Shellyites." Doyle v. Andis, 127 Iowa, 36, 102 N. W. 177, 69 L. R. A. 953, 4 Ann. Cas. 18.

In this country the rule has had its defenders and its critics, among the latter of whom have been some of our ablest judges, lawyers, and text-writers. But despite all criticism of, and antagonism to, the rule, both in England and in America, it has steadfastly prevailed, and has now become a fixed rule of property in this and other jurisdictions, where it is recognized.

There is a very complete note upon this subject in 29 L. R. A. (N. S.) 963 to 1170. On pages 1159 to 1170 are given the holdings of the several states upon the rule. At the time that note was written it appears that in 26 of the states the rule had been abrogated either wholly or partially by statute. In Kentucky, the rule has been held not to be applicable, but probably out of abundant precaution it was abolished by statute. In Vermont the rule appears to have no special application, except as a rule of construction and intention.

In Lacey v. Floyd our Supreme Court say:

"We believe that it would be for the public good if the Legislature would repeal the rule in Shelley's Case, and we respectfully recommend that it be done."

So far, this recommendation has not been adopted by the legislative branch, and until that is done but one course is open to the courts.

It would be presumptious, as well as a useless waste of time, to attempt a discussion of the innate soundness or unsoundness of the rule or of the reasons upon which it is contended that it does or does not violate the intentions of the testator or grantor. All that could possibly be said upon those questions has been iterated, reiterated, and elaborated by the ablest legal minds for several centuries. The gravamen of every contention urged in criticism of the rule may be reduced to one proposition, namely, that it violates the intention of the testator or grantor to create only a life estate in the first taker. The rule has been variously stated, but for our present purposes we quote the following from Coke:

"When the ancestor by any gift or conveyance takes an estate of freehold, and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs in fee or in tail, always in such cases heirs are words of limitation of the estate, and not words of purchase." 1 Coke, 104, 2.

The uniform conclusion is reached that no matter how clear and unequivocal the language by which a life estate only is sought to be given to the ancestor, this purpose and intention is overturned by granting in the same instrument a remainder to his heirs, general or special. And this is held to be true, not because the testator or grantor has not evidenced an explicit intention to grant only a life estate to the ancestor, but because the word "heirs," when there is no evidence in the instrument to show that the term was used other than in its generally accepted or technical sense, embraces the whole line of succession from generation to generation, and designates not merely the persons who at a particular time, namely the death of the ancestor, are to take, but also designates the quality in which they are to take, that is, as heirs or by inheritance; from which it is reasoned and held that in order to take as heirs or by inheritance the fee must first be vested in the ancestor, and therefore the life estate in him is enlarged by operation of law into a fee. The reasoning is that there are thus manifested two intentions; one that a life estate only is granted to the ancestor, and the other that a heritable estate is granted in the remainder to the heirs; that these intentions are necessarily conflicting; that the policy of the law is to regard and hold the latter as paramount; and that consequently the former is destroyed and annulled, not construed away, as contended by some. The analogy is drawn to a case in which a fee-simple title is vested by will or deed in a person, and in the same instrument it is provided that the donee shall not convey or devise the property. The intention of the donor to prevent alienation, however clearly expressed, must in such instance give way, because that intention is unlawful; and so by the rule in Shelley's Case, the intention to create a life estate only is destroyed because it is unlawful for one to create a life estate in the ancestor and by the same instrument create a heritable estate by remainder in his heirs.

That in every case where the word "heirs," general or special, is not shown to be used other than in its ordinary or technical sense, the rule applies, even though there is an unequivocal manifestation of intention to grant to the ancestor only a life estate, is clear from the authorities above cited.

In Hancock v. Butler, Judge Roberts, speaking for the court, says:

"He [the grantor] had no right (terms are used applicable to real estate, so as to convey the idea) to reduce the estate, conferred on Josiah, to a life estate, if in the same deed he made the issue of Josiah derive an estate in fee or fee tail from and through Josiah, as his heirs, by descent."

Again, after quoting with approval Kent's statement of the rule, he says:

"This result would follow, although the deed might express that the first taker should have a life estate only. It is founded on the use of the technical words, 'heirs,' or 'heirs of his body,' in the deed, or the will.

"The rule in Shelley's Case is said to be a rule of law. It is really an organic rule, entering into the creation of the estate of inheritance. The whole must embrace all its parts. The existence of the whole being established, or taken for granted, it cannot be true that a part of the whole is wanting; that is, if it takes four sides to complete a mansion, its completion being admitted, by a law in physics, it cannot be true that the mansion has three sides only. In that sense, it is a rule of law."

In Simonton v. White, Judge Brown, speaking for the court uses this language:

"Under the rule in Shelley's Case, the words 'give and convey unto the said Ava Anna Simonton and her *bodily heirs*' if not qualified, would vest in Mrs. Simonton an estate in fee simple, not because the grantor intended to convey to her such estate, but because the law gives to the language that effect."

Judge Brown also delivered the opinion in Lacey v. Floyd. The provision of the will there under construction was to the effect that certain real property was devised to testator's son "to hold during his natural life and at his death to his lawful heirs." It was held that the rule in Shelley's Case applied, although it clearly appeared from the language that the testator intended to give his son only a life estate in the property. The court held:

"Unless qualified and limited by some other provision or language of the instrument, the words quoted above vested in Amos B. Steele a fee-simple title to the land by operation of the rule in Shelley's Case."

The court then proceeds to hold that the mere fact of solicitude for his grandchildren on the part of the testator was not sufficient to overcome the presumption that the word "heirs" was used in its technical sense, and further:

"It is contended that the use of the words 'at his death,' in connection with the phrase, 'his lawful heirs,' designates the persons, who were living at the time of his death as 'his lawful heirs,' and reference is made to Hancock v. Butler (21 Texas, 804) as authority for the position. It is true that some of the language used by Judge Roberts in the discussion of that case might be construed to mean that the words 'at his death,' qualify the word 'heirs,' but a careful examination of the opinion and a reference to the authorities upon which he bases his statements will show that the words 'after his death,' have been considered with other words and provisions to be pertinent, but have not alone been given such effect. In that case Judge Roberts elaborately reviewed the rule in Shelley's Case in many of its phases, but finally concluded his opinion with this statement: 'What is decided now is, that the words "lawful issue" as they stand in this deed, are words of purchase and not of limitation. No other question having been made, none other will be decided.' The question was correctly decided in that case, but it was based mainly upon the use of the word 'issue' instead of the technical word 'heirs.' The distinction between that case and this is, that in this case instead of 'issue' the word 'heirs' is used, to which the rule in Shelley's Case is peculiarly applicable. If the words 'at his death,' designating the time when the party should take, indicate the persons who would then inherit from the life tenant to be the particular class of persons constituting 'lawful heirs,' then how could the rule in Shelley's Case ever be given effect, for every life estate must in regular course terminate at the death of the life tenant, and the persons designated to take the remainder must take 'at his death'—these words furnish no interpretation of 'lawful heirs.'"

In Seay v. Cockrell the opinion is by Chief Justice Gaines. In referring to the contention that the heirs were intended to take by purchase on account of restrictions upon alienation and use of the expression "upon their death," the court say:

"It is argued strenuously in behalf of appellant that because these provisions are found in a will and not in a deed they must receive a more liberal construction than if they were found in an instrument of the latter character. It is possible this rule may be correct, yet, under the provision which brings it so clearly within the rule in question, we fail to see that there is any room for construction in applying the rule in Shelley's Case as commonly laid down; and, unless the will shows very clearly that the rule ought not to apply, it must be followed. We do not know how to argue what appears to us so plain a proposition."

In that case Judge Gaines quotes with approval Preston's statement of the rule as modified by Kent, and says, "The rule in Shelley's Case is in force in this state," citing Hancock v. Butler, Lacey v. Floyd, and Simonton v. White.

In Hunting v. Jones, as in Simonton v. White, the rule was recognized in all its force, but it was held not to apply under the particular wording of the instruments under construction. In the former case the word "heirs" was used a number of times in various sections of the will, and manifestly used not in its technical sense, but as synonymous with children. The considerations which lead to this conclusion are summarized in the last paragraph on page 960, extending to page 961. The particular provision of

the will there under construction was section 4, which gave certain real estate to William E. Jones "to have and to hold during his lifetime, and at his death the same to revert to his heirs by his present wife, Mary B. Jones." It was conceded that if the language just quoted stood alone, the contention that the rule applied and the fee vested in William E. Jones was under the authorities correct.

It was said with reference to the use of the words "heirs by his present wife":

"The use of these words, therefore, when given their technical meaning, presupposes an intention in the one employing them to create a heritable estate, which is inconsistent with an estate for life only. Therefore the previously granted life estate, however clear the language creating it may be, must be enlarged to give effect to this presumed intention to create a heritable estate in the remaindermen. It is by this process of reasoning that the defenders of the rule contend that its application does not defeat the primary intention of the testator. It would be unprofitable to enter into any discussion upon the merits of this contention. The tenacity with which our American courts have adhered to this rule, especially with regard to the words 'bodily heirs,' as presupposing an intention to create an estate which has long since been made impossible by statute, may be regarded as singular. The rule, however, is now recognized as a rule of property in this state, and the plain duty rests with the courts to give it effect, where clearly applicable."

In the same connection we quote further from Lacey v. Floyd:

"The rule in Shelley's Case is in force in Texas and has become a rule of property. Upon the faith of that law, many, like plaintiffs in error, have purchased lands, believing they were securing good titles. It may be true that the rule in Shelley's Case will defeat the intention of the testator; he should have known the law, and could have expressed his intention differently so as to give it effect; but the purchaser had the right to deal with the property upon the presumption that the intention of the testator conformed to the law. The courts have no power to change the law in order to enforce the intention of the testator in disregard of the rights of those claiming under the will."

The case of Brown v. Bryant is practically on all fours with the present case. The will there under construction devised certain real estate in five equal undivided shares to the surviving wife and four children of the testator. The will then provided:

"It is my express will that the lands bequeathed herein to my said wife and children is limited to them and each of them during their natural lives, to be used and controlled by them free from all rents, and after their death to go to, and be the property in fee simple of, their heirs."

The Court of Civil Appeals, speaking through Chief Justice Tarlton, in holding that the rule applied and the wife and children took the property devised to them in fee and without remainder, say:

"In January, 1840, the common law, as far as consistent with the Constitution and laws of this state, was adopted as the rule of decision. Hence the rule in Shelley's Case, which obtains at common law, must be regarded as a rule of property and of public policy to be applied in the construction of wills in Texas, as much so as if it had been specifically thus adopted by legislative enactment. Hence, also, the word 'heirs,' as used in the bequests under consideration, must be regarded as a word of limitation, and not of purchase, and we are constrained to hold that the will passed the absolute fee to this property to the widow and children named, and not merely an estate for life, as held in the court below. We content ourselves with stating this conclusion without elaboration, and with the citation of the following authorities, which we think sustain the conclusion: Tied. Real Prop. §§ 433, 434; 2 Washb. Real Prop. 273; Hancock v. Butler, 21 Tex. 804; Hawkins v. Lee, 22 Tex. 547; O'Brien v. Hilburn, Id. 624; Rodgers v. Burchard, 34 Tex. 452; Polk v. Faris, 9 Yerg. 209; Doedler's Appeal, 64 Pa. St. 9, quoted in 22. Am. & Eng. Enc. Law, 498, 499."

It has been repeatedly held, however, that the rule does not preclude an examination into the question whether the donor used the word "heirs," general or special, in its ordinary or technical sense, or whether he used "heirs" ignorantly or carelessly as synonymous with some other word which might designate some particular individual or individuals less than those who would come under the general designation of heirs. This is a question to be determined before the rule in Shelley's Case can be invoked, and in determining it the ordinary canons of construction by which the intention of the donor is to be arrived at may properly be resorted to. This rule has been recognized, not only in this state, but in all jurisdictions where the rule is in force. This point is very clearly brought out in Mr. Hargraves' celebrated treatise on the rule which was written at the time the controversy existed in England over the decision in Perrin v. Blake. He says:

"What the donor or testator means by heirs, or heirs or heirs-male of the body, or issue, should be first adjusted, without the least reference to or thought of the rule. Till that meaning shall be settled, it is uncertain, whether the rule in Shelley's Case may not be quite a foreign consideration. When indeed, it is once settled, that the donor or testator has used words of inheritance according to their legal import; has applied them intentionally to comprize the whole line of heirs to the tenant for life; has really made him the terminus or ancestor, by reference to whom the succession is to be regulated; then too it will appear, that being considered according to these views of policy, from which it originated, it is perfectly immaterial whether the testator meant to avoid the rule or not; and that to apply it and to declare the words of inheritance to be words of

limitation, to be words vesting an inheritance in the tenant for life, and to be words vesting a remainder in fee or in tail in him as the ancestor and terminus to the heirs, is a mere matter of course. * * * On the other hand, if it shall be decided that the testator or donor did not mean, by the words of inheritance after the estate for life, to use such words in their full and proper sense; did not mean to involve the whole line of heirs to the tenant for life, and to include the whole of his inheritable blood; did not mean to ingraft a succession on his preceding estate, and to make him the ancestor or terminus for the heirs; but, instead of this, intended to use the word 'heirs' in a limited, restrictive, and untechnical sense; intended to point at such individual person, as should be the heir, or heir of the body of the tenant for life at the moment of his decease; intended to give a distinct estate of freehold to such single heir, and to make his or her estate of freehold the groundwork for a succession of heirs to constitute him or her the ancestor terminus and stock for the succession to take its course from; in every one of these cases, the premises are wanting, upon which only the rule in Shelley's Case interposes its authority; it is clearly a case in which the remainder to the heirs of the tenant for life, having the premises belonging to a purchase, cannot inure by limitation or descent; and thus the rule in Shelley's Case becomes quite extraneous matter."

In Simonton v. White, the court say:

"However, that rule does not preclude a construction of the words 'bodily heirs' so as to ascertain the grantor's intention, but the well-established doctrine is, if it appears from the instrument that Gentry used the words 'bodily heirs' to designate children of Mrs. Simonton, effect will be given to that intention and the estate conferred upon her will be limited to her life with remainder in fee to the children thus pointed out. Doe v. Laming, 2 Burroughs, 1100; Taylor v. Cleary, 29 Grat. 448; May v. Ritchie, 65 Ala. 602."

The following is from Hunting v. Jones:

"The rule does not, however, prevent an inquiry into the question whether, from a fair construction of the instrument, the otherwise technical words were in fact employed in a nontechnical sense, and as synonymous with some other words which designate only the persons who are to take. In pursuing this latter inquiry, resort may be had to certain well-established principles of construction."

We are unable to discover anything in the will before us which can be regarded as an indication that the testator used the words "heirs" or "heirs at law" in any other than their ordinary or technical sense. As shown above, the fact that he clearly intended to grant to his living nieces and nephews only a life estate in the property devised to them, the fact that he may have had solicitude for his grandchildren, and the fact that he used the expression "at their decease," are not sufficient to overturn the legal presumption that the words "heirs at law" and "heirs"

were used technically. There is no place in the will where the words "heirs" or "heirs at law" are used, nor can it be said that there is anything at all to indicate that those words were used as synonymous with children. In making the devise to the children of Anna Dellis, his deceased niece, he refers to them as children. No distributive words are used, as was the case in Hunting v. Jones in connection with the words "heirs" or "heirs at law." While it is clear no doubt that the general scheme of the testator was to give to his living nieces and nephews only a life estate, and that at their death the remainder to each should vest in their children if living, who would in that event be their heirs at law, nevertheless there is nothing even intimating that in case all the children of any one of such living nieces and nephews should predecease their father or mother the remainder would then lapse and vest in the heirs of the testator as an undisposed of remainder. Under all the authorities in this state—and we think we may safely say under those in other jurisdictions—the language of this will brings the case clearly within the rule in Shelley's Case, and requires vesting the fee in the living nieces and nephews, regardless of a clearly expressed intention of the testator to grant to them only a life estate. Rules for the construction of words in instruments of this character do not permit of resort to mere supposition in order to determine the intention of the author of the instrument. There must be something more than this; something tangible upon which to base a positive assertion that there is a manifest intention on his part not to use the words in their ordinary or technical sense. We may well surmise that the author of this will not only intended that his grandchildren should share in his bounty, but that he may also not have had in mind the contingency that any one of his living nieces or nephews might survive all of their children. But this is merely a surmise, based upon a purely supposed scheme of the testator, and is not supported by any language found in the will. We are therefore left no alternative but to conclude that the words "heirs at law" and "heirs" cannot be given any other meaning than that in which they are technically understood in law, and as such words of limitation or inheritance, and not words of purchase.

It may not be amiss to note, although it could have no bearing upon the decision of the instant controversy, that in this case, as in the case of Lacey v. Floyd, the life tenant has conveyed by general warranty deed, purporting to pass the entire fee, the land which was set aside to him as his share under the will, and the purchaser of that property no doubt acted upon legal advice, which according to our view, was correctly given.

Courts are not at liberty to set aside or construe away established rules of law which have become rules of property, whether or not they may feel that those rules are unsound in principle and should not originally have been adopted. As was said by an able federal judge:

"Not infrequently unsound propositions have become so incorporated into the jurisprudence as developed by the courts that they have become rules of property rights. They become the basis of legal advice. The lawyer considers it safer to follow a poor opinion than a good reason. In such case disregard of, and change in, the rules as applicable to past transactions, might bring about unjust and inexcusable results." Whitehead v. U. S., 245 Fed. 392, 157 C. C. A. 554.

Language to the same effect has been repeated from time to time by courts of last resort in reference to the particular rule here under consideration.

We conclude that the judgments of the district court and Court of Civil Appeals should be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.