# FIRST NAT. BANK OF PARIS v. WALLACE et al. (No. 3585.)*

Court of Civil Appeals of Texas. Texarkana. Dec. 13, 1928.

Rehearing Denied Jan. 3, 1929.

*Writ of error granted.

Long & Wortham and W. F. Moore, all of Paris, for plaintiff.

W. A. Hutchison and Beauchamp & Lawrence, all of Paris, for defendants.

LEVY, J. (after stating the facts as above). The two points on appeal, presented respectively by the bank and Mrs. P. K. Wallace, are: (1) Whether the rule in Shelley's Case applies to the portion of the will devising the 181.7 acres of land in controversy; and (2) whether Mrs. P. K. Wallace and her husband had a homestead interest in the land at the time the deed of trust thereon was executed. It is uniformly conceded that the rule in Shelley's Case is a rule, not of construction, but distinctly of law and property. 24 R. C. L. p. 905; 2 Alexander on Wills, § 901. Such rule forms no part of the construction of the will. The rule will simply prevail and control in so far as the intention of the testator in passing the remainder may be repugnant to the rule. The intention of the testator in passing the remainder is purely a matter of construction. This is to be ascertained only by the employment of the ordinary rules of construction of written instruments by the language used therein. If the testator has used only words to which the law has attached definite and fixed meaning, and which in law mean nothing else, then the courts (quoting from the rule of construction) "must take what he said, not what he meant. The law inexorably fixes the force and meaning of the instrument, and it will not yield to individual intention."

The provision of the will bearing upon the contention reads:

"Third. We give and bequeath to our son the said P. K. Wallace, his natural lifetime, all our lands, consisting of farm, pasture and timber lands; and he the said P. K. Wallace is to have the use and benefits of said lands during his natural lifetime, and at his death the same is to go to his bodily heirs equally, the intention of this will being for the purpose of the prevention of the said P. K. Wallace disposing of the lands above mentioned. We, the said W. J. Wallace and wife Betty Wallace, desiring to have this property go to his bodily heirs after his death, and not to become the property of any other person or persons whomsoever, either before or after his death, other than his own bodily heirs."

The words used, "his natural lifetime" and "during his natural lifetime," clearly evince an intention to devise only a life estate to P. K. Wallace. This intention is emphasized by the clause which attempts to place restriction upon the power of alienation by P. K. Wallace. This clause of intended restraint upon alienation is of feeble and not of controlling influence, so far as the ultimate question involved is concerned. If only a life estate was intended to be vested in him, then there was no reason for imposing a restraint upon the power of alienation. And the clause of general restriction of alienation must be disregarded if it can be affirmed from the further parts of the will passing the remainder that only words were employed which legally operate to give the fee-simple title to P. K. Wallace. A fee-simple title necessarily implies absolute dominion over the land, and this cannot exist if the power of disposition is hampered by a general restriction destroying the absolute dominion inherent in the owner of the fee. The first requisite of the rule therefore exists of a life estate in the first taker. The manifest intention of the testators that P. K. Wallace was to take nothing more than a "life estate only," as is the effect of the language, would not of itself afford ground to hold that the rule in Shelley's Case does not apply. Crist v. Morgan (Tex. Com. App.) 245 S. W. 659, and authorities there cited. While the intention may confessedly have been to give the first taker but a life estate, the rule converts such estate into a fee in case the terms of the devise over to the bodily heirs can be treated as a limitation of the estate of the first taker to his heirs merely in their capacity as such. Proceeding further to an analysis of the language used, in order to determine whether the re-

maindermen take as heirs in their capacity as such, the words are: "And at his death the same is to go to his bodily heirs equally." The further words, "his bodily heirs," are in the same sense, and are but a reiteration of the meaning conveyed by "his bodily heirs." If the clause in the will contained the words only "shall go to his bodily heirs," it would unquestionably carry the present case far within the rule in Shelley's Case.

■ Invariably in construing a will or deed, where the words "heirs" or "heirs of the body" are used in passing the remainder, and there are no qualifying or explanatory words or expressions employed in the context, there is indulged a presumption that such words were employed and intended to be used by the testator in their strictly technical sense of the person upon whom the law casts an estate in real property immediately on the death of the ancestor, as distinguished from one who takes by will as a devisee. Scott v. Brin (Tex. Civ. App.) 107 S. W. 565; Seay v. Cockrell, 102 Tex. 280, 115 S. W. 1160; Lacey v. Floyd, 99 Tex. 112, 87 S. W. 665; White v. Dedmon (Tex. Civ. App.) 57 S. W. 870; Johnson v. Morton, 28 Tex. Civ. App. 296, 67 S. W. 790; Calder v. Davidson (Tex. Civ. App.) 59 S. W. 300; Hawkins v. Lee, 22 Tex. 544; Texas Co. v. Meador (Tex. Com. App.) 250 S. W. 148; Peters v. Rice (Tex. Civ. App.) 157 S. W. 1181; Crist v. Morgan (Tex. Com. App.) 245 S. W. 659; 24 R. C. L. p. 902; 13 Cyc. 659; 2 Devlin on Real Estate (3d Ed.) § 846; 2 Underhill on Wills, § 660; 2 Alexander on Wills, § 910.

■■ These decisions, to which many more might be added, do no more than give expression to a long-existing and well-known rule affixing to the words "heirs" or "heirs of the body" the strictly legal meaning stated. It is presumed that, when a testator devises an estate for life, with remainder to the "heirs" or "bodily heirs" of the devisee of that estate, he intends the remaindermen to take as heirs of the body by descent from their ancestor rather than as purchasers, themselves the root of a new succession. It is to be closely observed that there is no language in the will in point upon the question considered, outside of the simple wording shall "go to his bodily heirs equally." So that the simple inquiry is, Does the word "equally" appearing in the provision have the effect of changing and diverting the strictly technical meaning of the words, "bodily heirs" into vernacular language in the sense of "children only?" If it does not have that effect, then clearly the rule in Shelley's Case has application to the will. It is not difficult to give adequate reason for answering the question in the negative, namely, that distributive words, of themselves and alone, are not words appropriate and sufficient to modify and divert the meaning of the strictly legal words "bodily heirs." Expressions, "share equally" and the like, are not equivalent of "bodily heirs." According to the valid rules of grammar, "equally" does not modify or set bounds to the words "bodily heirs." The word is joined to the preceding verb, "go," "shall go equally," or alike. That is the plain meaning of the word in its ordinary conception. In a grammatical sense the meaning of the provision is that the interests in the lands of the persons constituting "his bodily heirs" shall be equal and alike. And distributive words like "share equally" or "equal shares" are not such strictly legal terms or such particular words which according to the well-settled canon of construction may be construed as words appropriate and sufficient to qualify or modify the strictly technical words "bodily heirs" or "heirs." They are not expressions equivalent of the technical words "bodily heirs." That is exactly the reason, and the same reason, given in numerous cases construing like or similar simple wording such as that of the present will. Pearce v. Carrington (Tex. Civ. App.) 124 S. W. 459; Pearce v. Pearce, 104 Tex. 73, 134 S. W. 210; Knox v. Barker, 8 N. D. 272, 78 N. W. 352; Davenport v. Eskew, 69 S. C. 292, 48 S. E. 223, 104 Am. St. Rep. 798; Stigers v. Dinsmore, 193 Pa. 482, 44 A. 550, 74 Am. St. Rep. 702; Cockins & Harper's Appeal, 111 Pa. 26, 2 A. 363; Holt v. Pickett, 111 Ala. 362, 20 So. 432; Taney v. Fahnley, 126 Ind. 88, 25 N. E. 882; Peacock v. McCluskey, 296 Ill. 87, 129 N. E. 561; notes, 29 L. R. A. (N. S.) page 1091; Simms v. Buist, 52 S. C. 554, 30 S. E. 400. As, for illustration, in Allen v. Craft, 109 Ind. 476, 9 N. E. 919, 58 Am. Rep. 425 (where the Shelley Case is in force), the court positively stated, as the reason for the construction given "because the explanatory or superadded words ["to be equally divided among them," the "heirs of her body"] do not show with that certainty which the law requires that the word ["heirs"] was not used as a word of limitation."

Likewise in Cook v. Sober, 302 Ill. 498, 135 N. E. 60 (where Shelley's Case is in force), the court expressly stated, as the reason for the construction given, that the added words of direction to divide the estate "equal among them" are not "sufficiently explanatory words" of the word "heirs" to change its fixed legal meaning, for "it means only that the heirs are to have equal rights as heirs and in that character." In the early English case of Jesson v. Wright, 2 Bligh 1, 10 Eng. Rul. Cas. 714, the words "share and share alike" were commented upon as making no difference in the fixed legal meaning of the words "heirs" or "heirs of the body," because they were not sufficiently explanatory or qualifying words of such technical term. In some decisions, where the rule exists, words directing the manner of distribution appear to have been taken into con-

sideration in the purpose to harmonize one part of a provision with another in accord with the general intent of the context. For instance, in the case of Dukes v. Faulk, 37 S. C. 255, 16 S. E. 122, 34 Am. St. Rep. 745, the words were:

"Such heirs as my said step-daughter Emelia and my son Stent shall leave living at the time of their death, begotten by them, share and share alike, to them and to their heirs, executors, administrators, and assigns, forever; * * * and should my said step-daughter Emelia leave no heirs begotten by my said son Stent, capable of inheriting, then * * * said property shall descend to my daughter Ann Eliza, wife of A. Gilliland."

The words "share and share alike" were associated with the words "living at the time of their death, begotten by them," as words intended to be equivalent to "surviving children." In Clemens v. Heckscher, 185 Pa. 476, 40 A. 80, the words were:

"Equally to and among all the heirs of her body, if she should have any; the children * * * of any one of her children who may be dead to take collectively what their parent * * * would be entitled to if living * * * and, in default of such heirs, equally to her brothers and sisters and their heirs."

The ruling was, quoting:

"If the bequest had been to Mrs. Clemens, with remainder to 'the heirs of her body,' and no context to show the testator's intention as to what he intended to mean by the use of these words, the contention of * * * counsel * * * would be correct. * * * But in the will there is so much more to show that the use of the words 'heirs of the body' was limited to certain 'children alive at the death' of * * * the first taker, and the living descendants of any then dead."

Such cases are cited and commented upon merely to show that none of them are comparable to the simple language of the present case. Several cases in Texas appear where distributive words were commented on, but there is a distinguishment between them and the present case. Hancock v. Butler, 21 Tex. 804; Simonton v. White, 93 Tex. 50, 53 S. W. 339, 77 Am. St. Rep. 824; Hunting v. Jones (Tex. Com. App.) 215 S. W. 959.

The Hancock Case, supra, was construing a deed; and the words were: "And at his death to his lawful issue." The court was explaining that the word "issue" was a flexible or ambiguous word, and not of the same definite and fixed legal meaning as the words "heirs" or "heirs of the body," and because thereof the presumption as to its meaning was much weaker and more easily overcome by ordinary words or expressions, such as words of distribution. The court used words "equal" and "share and share alike" as words tending certainly to show that "lawful issue" was used in the meaning of "children." But

there is no intimation or implication arising that the court meant to hold the words "equal" or "share and share alike," had they appeared in the clause, were words of appropriate pertinency and meaning to change or divert the fixed legal meaning attached to the words "bodily heirs." The court expressly states, in respect to "equally" or "taking an equal part," as words appropriate and bearing upon the meaning of the flexible words "lawful issue," "it is presumed it would be difficult to find one case where a man had expressly given his property to all his descendants, to take per capita—children, grandchildren, greatgrandchildren, etc. The general sense of American mind, as exhibited in deeds, wills, and statutes of descent and distribution, is that it is proper to give property to children, grandchildren, etc., they taking per stirpes. So we may well presume, in this case, that such persons were meant. They would be the same persons usually designated by the words 'heirs of the body.' It does not follow, however, that this sentence, with the word 'issue' in it, means the same thing in this deed as it would have meant if 'heirs of the body' had been inserted in its stead. For the words 'heirs' and 'heirs of the body,' * * * have a fixed legal meaning. They are the appropriate and necessary words to create" estates in fee. "A legal implication arises from them when used in a deed, over and above their import to designate particular persons; which is that the estate is to pass from person to person, through successive generations, in regular succession."

In immediate connection with the reasoning, the court further expressly observed a distinguishment between effect of distributive words upon the strictly technical word "heirs" and the more flexible term "lawful issue." The case of Jesson v. Wright, 2 Bligh 1, 10 Eng. Rul. Cas., was referred to as rejecting the clause "share and share alike" as not being words appropriate and sufficient to modify or qualify the legal effect of the term "heirs of the body," and stating that it and other cases were "not in conflict with" the case being determined, considering the words used. The ruling, as manifestly shown, had the sole point in view that the word "issue" in a deed, as appeared in the case, was ordinarily to be construed as a word of purchase and not of limitation as were the words "bodily heirs." The textwriters likewise lay down that rule of construction. 13 Cyc. 664; 24 R. C. L. p. 904. It is significant that the same court, in the case of O'Brien v. Hilburn, 22 Tex. 616, had before it the construction of a deed containing the words, "And at her death, to be the property, to be equally divided among and between the heirs of her body." The court decided, without comment, that the first taker "took an absolute estate"—citing "Haw-

kins v. Lee, supra [22 Tex.] 544, and cases cited." The cited case of Hawkins v. Lee rested on "4 Kent Com. 215; Hancock v. Butler, 21 Tex. 804." Therefore the Hancock Case may not be regarded as departing from the settled canon of construction that words like "share and share alike" or "equally," of themselves and standing alone, are not words of appropriate pertinency in meaning and bearing to change and divert the fixed legal meaning of the words "heirs" or "heirs of the body."

In the case of Simonton v. White, supra, the court was construing a deed from a father to his married daughter. The court declined to apply the rule in Shelley's Case, upon the ground, viz.:

"The purpose to be accomplished by the conveyance is declared in the following language: 'Now the above mentioned land and property hereby conveyed is not to be traded or sold, but the produce of the same are to go to the support of the said Ava Anna Simonton and her family during her natural life, and, at her death, to be equally and impartially divided between her bodily heirs.' * * * Governed by the rule in Shelley's Case, the requirement that the produce of the property should be applied to the support of the daughter and her children amounts to a false pretense, and the direction that, after Mrs. Simonton's death, the property should be equally divided between her bodily heirs, is impossible of execution and absurd. * * * The rule in Shelley's Case, if applied to this instrument, destroys all of the benefits which were intended to be conferred upon the children and renders the instrument incongruous and contradictory in all of its parts, while the enforcement of the well defined intention of the grantor harmonizes every provision of the deed. We conclude that Mrs. Simonton took an estate for life only with remainder in fee to her children after her death."

In determining the scope of the term "bodily heirs," the words "support of Ava Anna Simonton and her family during her natural life" seem to have had more influence on the decision than the words "shall be equally divided." The words "her family" are flexible and subject to construction meaning "her children." In this view, words equivalent to "her children" would be words appearing in the context, of appropriate pertinency in meaning and bearing, qualifying "bodily heirs" in the sense of "children." It is clear that the court did not rest the construction upon the words "equally divided," of themselves and alone.

In the case of Hunting v. Jones, supra, the court had before it the construction of a will of extended provisions. Substantially stated, the will gave a life estate to the testator's daughter, with remainder to "her bodily heirs equally;" and a life estate to a son, with remainder to "his bodily heirs by his present wife;" and providing that, if either should die "without any surviving heirs," the property "shall go to my other heirs, each sharing alike." Section 13 of the will stated:

"At the expiration of fifteen years after my death my executors shall wind up the business of my estate, [etc.] * * * And the remainder they shall distribute equally between my three children, or their heirs; if any of my children shall not be living, the heirs to take such part as the father or mother would have been entitled to had they been living," etc.

After consideration of the words of all the sections, the court concluded that the testator intended "to use the word 'heirs' in the sense of 'children.'" It is clear that the word "heirs" was employed in the sense of "children" in "sections 7 and 13," as stated by the court. The decision of the court was, as is expressly intimated, influenced by the words used of like meaning as the word "heirs" rather than the words "equally" and "share and share alike," of themselves and alone. The court quoted from Hancock v. Butler, supra, concerning the effect and ordinary conception of the meaning of "equally," and observed:

"But we are not required to resort solely to this well-settled presumption. That the testator did not intend that his 'heirs,' technically speaking, should share equally, is shown where, in section 13, he provides that 'his children,' if living, shall share equally, and the 'heirs' of such as shall have died shall take 'such part as the father or mother would have been entitled to.'"

This case, therefore, cannot be regarded as departing, or intending to depart, from the canon of construction that words like "equally" or "share equally" are not words, of themselves and alone, appropriate and sufficient to change and divert the fixed legal meaning of the words "heirs" or "heirs of the body."

It is true that a number of cases appear reported where a contrary construction was placed upon simple wording as in the instant case. For instance, besides others, the case of Bedford Jenkins v. Jenkins, 96 N. C. 254, 2 S. E. 522. It is well noted that the rulings are based upon wording of the statute; the rule in Shelley's Case being abolished by statute. See 29 L. R. A. (N. S.) p. 1158. Consequently they are of no importance in this suit.

 As to the second point on appeal it is believed, in the circumstances, a homestead right at the time of the mortgage is not shown. It is elementary that a family cannot have two homesteads, nor can there be a rural and an urban homestead at one and the same time. The tenancy at will by which P. K. Wallace and his family occupied the 45 acres of land in controversy during the

lifetime of his father, the owner, until the year 1910, would have been sufficient, under the authorities, to entitle P. K. Wallace to claim a homestead right by virtue of tenancy in the said 45 acres as long as he occupied the premises. However, the homestead of a tenant, in the very nature of it, cannot exist longer in the tenanted premises than the tenancy itself exists. According to P. K. Wallace's own testimony, when he left his father's farm in the year 1910, he moved to the incorporated town of Deport and acquired a home there, living there until the year 1919, and engaged in urban pursuits, although it appears that for two or three years after he moved to Deport he also engaged actively in the farming business. After living in the town of Deport until 1919, in his own language he then says:

"I moved to Paris in 1919, in December, I do not remember the date, about the 10th or 15th, somewhere along there. I sold my home in Deport and bought one in Paris, on Birmingham Street. I bought it from Clifford Wynne."

A person who pursued strictly an urban business for a number of years in Deport, and then sold his home there, and at once acquired another home in Paris, where he continued to live with his family as late as the year 1926, and who continued to pursue a strictly urban occupation, may not reasonably claim that all during that time he had a homestead in the country, based primarily upon his occupancy, not later than the year 1910, of a portion of said premises, as a tenant at will. If this tenancy at will did not terminate by reason of P. K. Wallace's moving away from the 45 acres previously held under said tenancy and by his subsequently acquiring two other homes, it certainly did terminate at the death of the owner of the premises, which occurred in the year 1919, the same year that P. K. Wallace and his family moved to Paris and occupied their home on Birmingham street. "As the phrase 'tenancy at will' implies at common law, such a tenancy is terminable at any time by either the lessor or the lessee, and the death of either the landlord or the tenant has this effect." 16 R. C. L. § 92, p. 612. And on page 613 of the same volume it is said: "If a tenant at will abandons possession of the premises, this is to be considered an abandonment or surrender to the landlord so as to continue the landlord's possession irrespective of the validity of the landlord's title."

If, however, it might be granted that under P. K. Wallace's tenancy at law of the 45 acres of the land in controversy he had the right, after having abondoned said premises, to return thereto and reoccupy the same as his homestead, that right cannot in law be merged in the right of ownership which became vested in him at the death of his father and mother. At the time of their

death P. K. Wallace was, with his family, occupying his own home in the city of Paris. A mere intention upon his part, as testified to by himself and his wife and one or two other witnesses, at some indefinite date in the future to move to the farm and to occupy it as a homestead, would not constitute an abandonment of his actual urban homestead, either in the town of Deport or in the city of Paris; and such intention is insufficient to impress the farm property with a homestead character. Giving a liberal construction to all of the evidence, that is as far as it goes in this case. It has been repeatedly held that the best evidence of homestead abandonment is that a new and permanent home has been acquired. Hudgins v. Thompson, 109 Tex. 433, 211 S. W. 586; Walker v. Dailey (Tex. Civ. App.) 290 S. W. 813 at 815. "Since no one can own two homesteads at the same time, if the debtor acquires a new homestead he thereby loses his rights in the former place of residence." 29 C. J. p. 944; Slavin v. Wheeler, 61 Tex. 654; and other cases. There is some evidence in the record to the effect that about the year 1914, after he moved to Deport, and while the premises still belonged to his father, W. J. Wallace, P. K. Wallace placed and kept some farm tools and things like that on the place, and had a bed in one of the tenant houses for his use. He testified:

"I had a room furnished for my own use that I stayed in when I was there. I would stay out there a week at a time during the busy season, the cotton chopping season, because I had to look after it. I furnished the money and looked after it, so I stayed there."

This is insufficient as tending to establish any homestead character in favor of P. K. Wallace in these premises, in view of the uncontroverted fact that during all of said time he had a home, and actually occupied it, either in the town of Deport or in the city of Paris, pursuing an urban occupation. The accepted rule is:

"The occupancy must be of such a nature as will stamp the place claimed as a homestead with the character of the residence of the party claiming the homestead. Since the law will not lend its aid in the perpetration of a fraud upon creditors, the occupancy must be bona fide and not a sham. The fact that premises are occasionally occupied as a lodging place or temporary residence will not impress the homestead character thereon, especially where the actual and permanent residence of the debtor and his family is elsewhere." 29 C. J. p. 806, § 53; Fort v. Powell, 59 Tex. 321; Moore v. Owsley, 37 Tex. 603; Moerlein v. Scottish Mtg. & Inv. Co., 9 Tex. Civ. App. 415, 29 S. W. 162, 948; Walker v. Dailey (Tex. Civ. App.) 290 S. W. 813.

The judgment of the district court is modified to the extent of vesting a fee-simple

title, instead of a life estate only, in P. K. Wallace in the lands, and foreclosing the mortgage lien of the plaintiff on said fee-simple title, instead of "the life estate" only, of P. K. Wallace, as against him and all other parties defendant to the suit, and the plaintiff to recover costs of the defendants. As so modified, the judgment will be in all things affirmed, the appellees to pay costs of appeal.